UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:05-CV-752-F(2)

| | | |
|---|---|---|
| SOUTHERN STATES IMPORTS, INC., <br> BOB DUNN, JR. and JEFF DUNN | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | ORDER |
| SUBARU OF AMERICA, INC., | ) <br> ) <br> ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross-motions for summary judgment. The motions have been fully briefed and are ripe for ruling.

## I. PROCEDURAL BACKGROUND

Defendant Subaru of America, Inc. ("Subaru") is the distributor of Subaru automobiles in North America. Plaintiff Southern States Imports, Inc. ("Southern States"), owns three motor vehicle dealerships in North Carolina, including Southern States Subaru, located in Raleigh. Plaintiff Bob Dunn, Jr., is an officer of Southern States. Plaintiff Jeff Dunn also is an officer, and part-owner, of Southern States.

On September 30, 2005, Plaintiffs filed the instant Complaint in the Superior Court of North Carolina, Wake County. Both Counts One and Two of Complaint allege that Subaru engaged in unfair trade practices, in violation of Chapter 75 of the North Carolina General Statutes, the North Carolina Unfair and Deceptive Trade Practice Act ("UDTPA"). Specifically, Plaintiffs allege that Subaru committed an unfair and deceptive trade practice by violating provisions of North Carolina's

Motor Vehicle Dealers and Manufacturers Licensing Law, N.C. Gen. Stat. § 20-285, *et seq.* ("the Motor Vehicle Dealers Act"). Subaru removed the action to this court on November 2, 2005, on the basis of diversity jurisdiction, and filed a motion to dismiss on the same date, arguing that Plaintiffs' claims must be dismissed for lack of subject matter jurisdiction because the claims were unripe, and that Plaintiff's claim under UDTPA should be dismissed for failure to state a claim. The court asked the parties to address the applicability of various parts of the Motor Vehicles Dealers Act. After receiving the parties' briefing on various issues, the court denied Subaru's Motion to Dismiss.

## II. FACTS

The parties submit that the undisputed facts are as follows:

### A. Southern States and the Raleigh Market

Plaintiffs Jeff Dunn and Bob Dunn, Jr., and their father, Bob Dunn, Sr., own varying interests in three Subaru dealerships in North Carolina: (1) Southern States Imports, Inc. d/b/a Southern States Subaru located at 2421 Wake Forest Road, Raleigh; (2) Bob Dunn Subaru in Greensboro; and (3) Southern States Subaru of Boone. Subaru Mem. in Support of Mot. for Summ. J. [DE-33], Appendix at pp. 2-3, 6-8, 78 (hereinafter "Appx."). Southern States Subaru first was established as a Subaru dealer in 1986. Appx. [DE-33] at p. 9. Since 1986, Raleigh has grown into a large metropolitan area with a population in 2003 of approximately 1.2 million people, and has become one of the largest markets in the United States with only one Subaru dealer. Appx. [DE-33] at pp. 62-63, 80. Subaru contends that because Southern States had such a large market to itself, it enjoyed a relatively high volume of sales of Subaru vehicles, but Subaru's share of the Raleigh market fell significantly short of the new motor vehicle market share or "market penetration rate" that Subaru expected based on the performance in similar markets. Appx. [DE-33] at pp. 63, 81-82. Subaru

explains that market penetration is a commonly used measure of performance in the motor vehicle industry, and measures the market share of a given motor vehicle brand, or "line-make," such as Subaru, among competing line makes. Appx. [DE-33] at p. 63. By 2003, Subaru concluded that it had lost considerable market share in the Raleigh market, or Area of Responsibility ("AOR") assigned to Southern States, which included Cary and Apex. Appx. [DE-33] at pp. 63, 81-82.

### B. The Dunns' Apex Property

At his deposition, Jeff Dunn testified that Cary and Apex have been growing rapidly over the past several years, and that "everybody knows in this area . . . that one day there was going to be a Subaru [dealer] in the Cary/Apex market, just like every other franchise is." Appx. [DE-33] at pp. 12, 22, 26). Subaru contends that since the mid-1990s, Jeff Dunn had told Subaru representatives that he wanted the new Subaru dealership if Subaru decided to split the Raleigh market and add another dealer. Appx. [DE-33] at pp. 12-67. Jeff Dunn proposed to located a new Subaru dealership on 12 acres he and his brother owned in Apex. Appx. [DE-33] at pp. 51, 61, 67. The Dunns already had constructed a Nissan dealership on seven acres of the Apex property, and proposed to place the Subaru dealership on the remaining five acres located behind the Nissan dealership. Appx. [DE-33] at pp. 37-38, 41, 67. Subaru contends that the proposed five-acre area is situated well back from the main road and would require customers to drive several hundred feet through the Nissan dealership to reach the proposed Subaru location. Appx. [DE-33] at pp. 41, 67, 100. Subaru also contends that Jeff Dunn only proposed to locate the new Subaru dealership in Apex, and had no property in Cary. Appx. [DE-33] at pp. 51, 51, 100.

### C. The Subaru Signature Facility Process

In 1998, Subaru initiated its Subaru Signature Facility Program. Appx. [DE-33] at p. 63.

3

Similar to programs initiated by other manufacturers, this program was intended to strengthen Subaru's brand identity by providing common design elements for Subaru dealerships. Appx. [DE-33] at p. 63. Subaru's goal for the program was to raise the profile of the Subaru brand, and increase sales–thereby benefitting both Subaru and Subaru dealers. Appx. [DE-33] at pp. 44, 63. As part of the program, Subaru assisted its dealers by helping them develop design plans and paying a portion of the costs for design and subsequent renovation or construction. Appx. [DE-33] at p. 63.

In June 2001, Southern States signed up for the Signature Facility design process. Appx. [DE-33] at pp. 63, 85. In November 2001, Jeff Dunn met with Linn Calder, Subaru's Regional Market Development Manager, and a team of architects to develop a Signature Facility design package for Southern States. Appx. [DE-33] at pp. 64, 85. Jeff Dunn testified that at the November 2001 meeting that Southern States was "very interested" in the possibility of a Signature Design facility. Appx. [DE-33] at p. 13. After reviewing the design proposed by the architects, Jeff Dunn decided to proceed with implementing the Signature Facility program, including an addition to the existing Subaru showroom and service reception area. Appx. [DE-33] at pp. 14-15, 64, 85.

On June 28, 2002, Jeff Dunn wrote to Linn Calder about his intentions with regard to the Subaru Signature facility. He specifically wrote:

> .... I would like to share with you our facility and expansion plans that will result in a high-level of focus on the Subaru franchise. We have ranked very high in the region and tops in the district in Subaru sales, but we feel that the excitement of a new facility can greatly improve sales numbers.

> In Raleigh, you and I have met previously to discuss a renovation of the existing Southern States Imports showroom. I have reviewed the plan, and while it may be acceptable to Subaru, I feel that it does not go far enough to accomplish our selling goals for Subaru. I feel that Subaru deserves an entirely new facility, and I am currently working with our architect to develop these plans. An exclusive Signature Subaru showroom would be built in the large parking area between the existing buildings in Raleigh.
>
> I would also like to have a commitment to add a Subaru franchise in Apex.
> . . .

Appx. [DE-33] at p. 90. Subaru represents that Linn Calder was encouraged by the June 28, 2002, letter, and believed that Southern States wanted to proceed with an exclusive facility. Appx. [DE-33] at p. 65. At Jeff Dunn's request, Subaru held another design meeting at Southern States in September 2002, where architects presented a revised Signature Facility design which Jeff Dunn reviewed and approved. Appx. [DE-33] at pp. 65, 95.

On July 1, 2003, Jeff Dunn again wrote Linn Calder, expressing the desire "to work with Subaru in developing a 'Win-Win scenario for our facilities" and the need to "further study . . . the Raleigh dealership facility." Appx. [DE-33] at p. 96. Jeff Dunn also explained his desire to open a stand-alone Subaru franchise in Apex. Appx. [DE-33] at p. 97. He informed Linn Calder:

> If you will allow us this opportunity, our market will be much better served. We can achieve a 'win-win' scenario for us both:
>
> - You will see a state-of-the-art exclusive Signature Subaru facility in Apex that will not be surpassed,
> - In Boone, we will have a fantastic Signature Subaru facility,
> - In Greensboro, we will have an outstanding Signature Subaru dual facility,
> - In Raleigh, we will have a state-of-the-art Signature dual facility.

Appx. [DE-33] at p. 97.

### D. The September 2003 Meeting and Letter

In September 2003, Linn Calder met with Jeff Dunn, his brother Bob, and Jeff Gorton, Southern States' Chief Financial Officer. Appx. [DE-33] at p. 65. Calder contends that he explained that although Southern States was selling a relatively large number of vehicles, Raleigh had become an even larger market with only dealer, and that both Southern States and Subaru were missing an opportunity for additional sales. Appx. [DE-33] at p. 65. Calder provided them with a copy of market study of the Raleigh area ("the 2003 Market Study") which included the following observations:

- The Subaru line-make was underperforming in the Raleigh area, resulting in considerable lost business for both Southern States and Subaru.

- Southern States' location on Wake Forest Road was less than ideal, possibly contributing to the performance problems.

- Due to the size of the Raleigh market and the low Subaru penetration, Subaru should consider whether a relocation of Souther States could increase sales or whether to split the mark and add another dealer.

Appx. [DE-33] at pp. 65, 79-84. Calder also contends that he explained Subaru's need to address the loss of market share in Raleigh, and his desire to discuss options with Southern States before any decisions were made to split the market and add another dealer. Appx. [DE-33] at p. 66. Subaru believed that Southern States might recapture the lost business by improving its facilities on Wake Forest Road, whether by renovation or new construction, or by relocating to the Cary/Apex area. Appx. [DE-33] at p. 66. Calder, however, maintains he did not discuss any specific location in either Cary or Apex. Appx. [DE-33] at p. 66. Calder also maintains he met with the Dunns to discuss options because he believed it was a smart business practice to consult with the affected Subaru dealer and look for solutions prior to making any decisions. Appx. [DE-33] at p. 66.

6

Calder followed up by sending to Plaintiffs a letter dated September 18, 2003, which summarized the discussion at the meeting. The letter, which became the impetus for this lawsuit, stated, in part, the following:

> Thank you for taking the time to meet with me this past week to discuss the status of Signature Facilities for the three Dunn Organization operations. As we discussed during the review of the Raleigh market study, our principle concern is the amount of perceived lost business in Raleigh and the Cary area.
>
> In discussion, we advised you that there are several options for your consideration. They are as follows:
>
> - Consider relocation of the current Southern States operation to the Cary/Apex area and build an exclusive Signature Facility.
>
> - Commit to construction of an exclusive Subaru Signature Facility at your current location. In the event that you move forward, we will allow you time to demonstrate the capability to recover the lost business. The time frame and methodology for determining sales targets to be determined.
>
> - Understand that if you do not seek to provide us with the Brand representation and sale performance we seek, we will consider the addition of additional representation in the Cary/Apex area.

Appx. [DE-33] at pp. 66, 98. Plaintiffs did not agree to relocate to the Cary/Apex area, and did not commit to constructing an exclusive Subaru Signature Facility.

### E. Splitting the Raleigh Market in 2005

Subaru contends that in 2005, it updated its 2003 Market Study and found that Raleigh had become the largest single-dealer Subaru market in North Carolina and was too big for one dealer. Appx. [DE-33] at pp. 99, 103. Based on this research, Subaru contends it decided to split the Raleigh market into two Areas of Responsibility or ("AORs") and appoint a new dealer in Cary. Appx. [DE-33] at pp. 99-100. In a letter dated May 10, 2005, Ikuo Donselaar, who succeeded Calder as Subaru's Regional Market Development Manager, summarized a meeting he had with the Dunns

7

and Jeff Groton where the men discussed Subaru's planned split. Appx. [DE-33] at pp. 107-08. Donselaar explained that the decision to split the market was based on the following:

- Raleigh was one of the lowest-performing Subaru markets in North Carolina.
- Similar-sized markets, such as Charlotte, had more than one Subaru dealer.
- Most of Subaru's competitors already had split the Raleigh market, and had located their second dealer in Cary.
- Subaru's penetration in the Raleigh market was low, especially in the western portion of the market, near Cary.

Appx. [DE-33] at pp. 107-08.

**F. Appointing a New Dealer**

Subaru contends in May 2005, it had not decided whom to appoint as a new dealer in the Raleigh market or where the new dealership would be located. Appx. [DE-33] at pp. 100, 113. It maintains that the location of a dealership, and the placement of facilities on the site, are of vital interest to Subaru, and it eventually determined that Cary would be the ideal location for a new dealership. Appx. [DE-33] at pp. 103, 115.

Southern States' attorney sent Donselaar a letter dated June 14, 2005, wherein he expressed his concern that Calder's September 18, 2003 letter appeared to violate the Motor Vehicle Dealers Act, and advised Donselaar that "[i]f a new point is indeed awarded and given to another dealer, Dunn Automotive Group would certainly have to consider its options afforded it under" the Motor Vehicle Dealers Act. Appx. [DE-33] at pp. 109-10.

Donselaar, in turn, wrote Jeff Dunn on June 23, 2005, and informed him that Subaru "has not currently selected Southern States Subaru, Inc., as the new dealer for the Open Point in the Cary/Raleigh Market." Appx. [DE-33] at p. 111. In the June 23, 2005, letter, Donselaar gave the

following reasons for Subaru's decision to not select Southern States for the new dealership point:

- Subaru considered the Cary Market to be a superior car market to Apex.

- Subaru considered Jeff Dunn's proposed site in Apex to be "less than desirable" for a new Subaru dealership because the "property is hardly visible from the main road of travel and your Nissan facility blocks the property from drive-by traffic."

- Subaru considered Southern States to be under-performing with regard to vehicle sales.

- Subaru considered Southern States to be under-performing with regard to market penetration.

- Southern States' "Subaru Owner Loyalty Index" average lagged behind national targets.

Appx. [DE-33] at pp. 111-12.

Subaru now asserts that it did not select Southern States, Jeff Dunn, or Bob Dunn, Jr., for the new dealership point for three reasons: (1) the Dunns already had three Subaru dealerships in or near the market; (2) Subaru believed that the location ultimately chosen in Cary was better than the Dunns' proposed location in Apex, and (3) Subaru considered Southern States to be underperforming at the time. Appx. [DE-33] at p. 117. With regard to the first reason, Subaru asserts that it strongly prefers not to have the same owner for more than one dealership located in the same or nearby market. Appx. [DE-33] at p. 117. According to Subaru, independent ownership increases intra-band competition, increases sales and benefits consumers. Appx. [DE-33] at p. 117. Subaru notes that the Dunns own not only the closest Subaru dealership in Raleigh, but also own Subaru dealerships in Greensboro and Boone. Appx. [DE-33] at p. 117. Subaru also notes that Jeff Dunn, Bobby Dunn, Jr., and Jeff Groton all have acknowledged that Subaru advised them prior to 2005 that the Dunns' ownership of the other Subaru dealerships in North Carolina would weigh against selecting them for

9

the new dealership point. Appx. [DE-33] at pp. 33, 50-51, 59.

With regard to the second reason, Subaru asserts that, based on market studies, it believed Cary was a better location for the new dealership if a site could be found there. Appx. [DE-33] at p. 117. The Dunns concede that they did not have a site in Cary. Appx. [DE-33] at pp. 61.

Finally, Subaru reiterates that, in its assessment, Southern States was not meeting its business plan during the 2002-2005 period. Appx. [DE-33] at p. 118. Southern States' three-year service Subaru Owner Loyalty Index was 42.8, compared with an average of 79 for other Subaru dealers in the region. Appx. [DE-33] at p. 118.

Subaru ultimately, in December 2006, appointed Honest Moon, LLC d/b/a Johnson Subaru of Cary as the new Subaru dealer in Cary. Appx. [DE-33] at pp. 116, 120. Eric Swanson, now the Subaru Regional Market Development Manager for the South Central Region, testified at his deposition that Carl Johnson, of Honest Moon, LLC, first came to the attention of Subaru because a District Sales Manager saw Johnson's name on a sign posted for zoning of a new dealership in an Auto Mall located in Cary. Pls.' Reply [DE-35], Ex. F. p. 12. According to Swanson, the District Sales Manager approached Johnson and asked if he had any interest in becoming a Subaru dealer. Pls.' Reply [DE-35], Ex. F p. 12. In Donselaar's deposition, he testified that Daniel Weaver of Weaver Bros, Inc., inquired about the open point for a Subaru dealership, but was eliminated because he was located too close to the Southern States' dealership in Raleigh. Pls.' Reply [DE-35], Ex. G pp. 13-14. In an affidavit executed after the deposition, Swanson asserts that two additional dealers expressed an interest in the open point, and that all of the dealers considered, other than the Dunns, proposed to locate the new dealership in Cary. Appx. [DE-33] at pp. 115-16.

10

## III. STANDARD OF REVIEW

Both Plaintiffs and Subaru move for summary judgment on the issue of liability in this case, arguing that there are no issues of material fact and that judgment as a matter of law is therefore appropriate. *See* FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party opposing summary judgment may not rest upon mere allegations or denials; a "mere scintilla" of evidence is insufficient to overcome summary judgment. *See Anderson,* 377 U.S. at 245-52. Summary judgment is, therefore, appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. ANALYSIS

Plaintiffs allege that the September 18, 2003, letter from Linn Calder gives rise to two claims under North Carolina's UDTPA. As this court already has noted, in the letter, Calder set forth the following options for Plaintiffs:

- Consider relocation of the current Southern States operation to the Cary/Apex area and build an exclusive Signature Facility.

- Commit to the construction of an exclusive Subaru Signature Facility at your current location. In the event that you move forward, we will allow you time

> to demonstrate the capability to recover the lost business. The time frame and methodology for determining sales targets to be determined.
>
> - Understand that if you do not seek to provide us with the Brand representation and sales performance we seek, we will consider the addition of additional representation in the Cary/Apex area.

Compl. [DE-1], Ex. A.

## A. Elements of an UDTPA claim

The UDTPA provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive practices, in or affecting commerce, are declared unlawful." N.C. GEN. STAT. § 75.1-1(a). To establish a claim under UDTPA, a plaintiff must show that (1) the defendant committed an unfair or deceptive trade act or practice; (2) the action in question was in or affecting commerce; and (3) that act proximately caused injury to the plaintiff. *See First Union Nat'l Bank v. Brown*, 603 S.E.2d 808, 818 (N.C. Ct. App. 2004).

Plaintiffs contend that the undisputed facts show they have established each of the three elements to their UDTPA claim, and thus, they are entitled to summary judgment as to Subaru's liability. Specifically, Plaintiffs contend that the statements in the September 18, 2003, letter constitute *per se* unfair and deceptive acts because the "options" violate the Motor Vehicle Dealers Act.[1] Alternatively, Plaintiffs argue that the statements in the letter are unfair and deceptive,

---

[1] Specifically, Plaintiffs argue that Subaru violated subsections 20-305(12) and (25) of the Act. The subsections provide, in relevant part:

> It shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or any representative whatsoever of any of them:
>
> . . .
>
> (12) To require, coerce, or attempt to coerce any new motor vehicle dealer in this State to change location of the dealership, or to make any substantial alterations to the dealership premises or facilities, when to do so would be unreasonable, or

12

regardless of whether they are in violation of the Motor Vehicle Dealers Act. Plaintiffs also contend the acts are "in commerce." Finally, Plaintiffs assert they have been injured in that they have been "depriv[ed] . . . of the opportunity to be awarded a new dealership point and . . . depriv[ed] . . . of the opportunity to sell automobiles, parts and service." Mem. in Support of Mot. for Summ. J. [DE-31] at p. 7. The court, however, concludes that Plaintiffs cannot prove the third element of their UDTPA claim, and therefore Subaru is entitled to summary judgment.

## B. Proximate cause of injury

Even if the court assumes that September 18, 2003, letter from Calder constitutes an unfair and deceptive trade practice within the meaning of UDTPA, the court still concludes that Plaintiffs cannot establish that the letter proximately caused them any injury. North Carolina appellate courts have determined that in order to succeed on an UDTPA claim, a plaintiff must prove that he has suffered actual injury as a proximate result of a defendant's unfair or deceptive act. *Edwards v. West*, 495 S.E.2d 920, 923 (N.C. 1998). In North Carolina, "proximate cause" is defined as:

> a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Adams v. Mills*, 322 S.E.2d 164, 171 (N.C. 1984).

---

without written assurance of a sufficient supply of new motor vehicles so as to justify such an expansion, in light of the current market and economic conditions.
. . .
(25) To require, coerce, or attempt to coerce a new motor vehicle dealer in this State to either establish or maintain exclusive facilities, personnel, or display space.

N.C. GEN. STAT. § 20-305.

13

With regard to proving the third element of an UDTPA claim, injury proximately caused by the unfair and deceptive act, Plaintiffs summarily assert the following:

> A new dealership point awarded at no cost to a dealer is obviously a thing of value. By depriving Plaintiffs of this opportunity to be awarded a new dealership point and by depriving the Plaintiffs of this opportunity to sell automobiles, parts and service, the Defendant has proximately caused an injury to the Plaintiff in the form of lost value and lost income.

Mem. in Support of Mot. for Summ. J. [DE-31] at p. 7. Fatal to Plaintiffs' argument, however, is the fact that Plaintiffs had no right or entitlement to be considered for the new dealership point. Jeff Dunn acknowledged during his deposition that Subaru was free to split the Raleigh market and appoint whomever it desired. *See* Appx. [DE-33] at pp. 23-26. Indeed, neither the Motor Vehicle Dealers Act, nor Southern States' dealer agreement with Subaru, provide Plaintiffs with any right or entitlement to be considered for the award of a new dealership–or "opportunity to be awarded a new dealership point", as Plaintiffs phrase it. *See* Appx. [DE-33] at p. 24, p. 69. It is difficult to conceive how the Plaintiffs could be injured by the deprivation of an "opportunity" to which they possessed no entitlement.

Another court in this district faced an analogous issue in *Strates Shows, Inc. v. Amusements of America, Inc.*, 379 F. Supp. 2d 817 (E.D.N.C. 2005). In that case, a carnival midway operator, Strates Shows, which had operated the midway for the North Carolina State Fair ("State Fair") for numerous years, bid on the contract for the 2002 State Fair. Another vendor, Amusements of America, and various North Carolina state officials and their associates, however, had initiated a conspiracy intended to secure the State Fair midway operation contract for Amusements of America. The 2002 contract ultimately was awarded to Amusements of America, which resulted in a public corruption scandal. Strates Shows eventually filed suit in this district, alleging a claim under the

14

Racketeer Influenced and Corrupt Organizations Act ("RICO") along with various state law claims. Chief Judge Louise W. Flanagan allowed the defendants' motion to dismiss, specifically concluding that Strates did not have standing to assert the RICO claim because (1) it had not identified any property interest which it had in the 2002 midway contract prior to the illegal activity by defendants, and (2) that any relationship between the defendants' illegal conduct and the harm to Strates–not being awarded the 2002 midway contract–was indirect and speculative. *Strates Shows*, 379 F. Supp. 2d at 828-32.

The *Strates Shows* plaintiff eventually filed suit again in North Carolina state court, alleging the same facts and various state law claims, including a claim under UDTPA. After various defendants' motions to dismiss were denied, the North Carolina Court of Appeals reversed, and concluded that Strates was collaterally estopped from asserting the state law claims in light of the earlier federal court decision which concluded that Strates Shows failed to establish that defendants' illegal activity was the proximate cause of its injuries. *Strates Shows, Inc. v. Amusements of America, Inc.*, 646 S.E.2d 418 (2007) (hereinafter *Strates Shows II*). Specifically, the North Carolina Court of Appeals observed:

> Upon reviewing the elements required for both a RICO and an [UDTPA] claim, we are able to see that each claim requires a showing by the plaintiff that he or she suffered an injury that was a proximate result of the defendant's improper actions, whether the improper actions constitute racketeering or unfair or deceptive acts or practices. Both Acts require a showing that the plaintiff suffered an actual injury, and that the defendant's improper, or illegal conduct was a cause in fact of the plaintiff's injuries.

*Strates Shows II*, 646 S.E.2d at 424-25. The North Carolina Court of Appeals held that Strates was collaterally estopped from relitigating the issue of proximate cause in the state action, explaining:

> The element of causation in Strates' federal RICO claim is the same as in the state

15

> [UDTPA] claim, and thus the state claims must fail based upon the federal court's prior ruling on the issue of causation. At no time was Strates actually awarded, or promised, the 2002 midway contract. Strates' state action fails to establish that but for defendants' illegal conduct, Strates would have been awarded the contract. Strates cannot show that if suffered any actual injury as a result of the illegal conduct, only that it was not awarded the midway contract. . . . The fact that defendants participated in an illegal conspiracy surrounding the 2002 midway contract does not create an automatic claim under the [UDTPA]; Strates still must show a causal relationship between the alleged improper act and the injury claimed. Even assuming defendants' conduct constitutes actionable conduct pursuant to section 75-1.1 *et seq.*, Strates has failed to show that it suffered any actual injury as a matter of law that was proximately caused by the illegal conduct.

*Id.* at 425.

Although not directly on point, the court finds the reasoning in *Strate Shows* and *Strate Shows II* to be applicable to the instant case. Although Plaintiffs frame the injury as the "opportunity" to be awarded the new dealership, as opposed to the award itself, the same reasoning applies: Plaintiffs had only an expectancy interest in the "opportunity" to be considered for the new dealership point. As this court already observed, the record makes clear that nothing obligated Subaru to consider Plaintiffs for the award of the new dealership point. *Cf. Strates Shows*, 379 F. Supp.2d at 826-28 ("Contributing to the speculative nature of the plaintiff's RICO injury, plaintiff points to no property interest which it had in the 2002 midway contract . . . prior to the racketeering activity"); *Strates Shows II*, 646 S.E.2d at 426 (reiterating that Strates was never promised the midway contract, and consequently it could not establish that its alleged injury–not being awarded the contract–was proximately caused by illegal conduct).

Moreover, although Plaintiffs also contend they have suffered injury from "the loss of value in being awarded a new dealer point and the lost opportunity to have the benefit of those sales of automobiles, parts, and service" from the new dealer point, *see* Plaintiffs' Reply [DE-35] at p. 6, such

16

Case 5:05-cv-00752-F   Document 46   Filed 05/30/08   Page 16 of 18

an allegation does not suffice to establish proximate cause. To rely on such an argument requires the assumption that Plaintiffs, if accorded the opportunity to be considered for the new dealership point, would in fact have been awarded the point. However, the court agrees with Subaru that even if Plaintiffs had some sort of entitlement to be considered for the new dealership point, "there is no proof, and it would be sheer speculation to presume, that the 'opportunity' would have led to an agreement between the parties for the Dunns to establish a new Subaru dealership on their property in Apex." Def.'s Mem. in Resp. to Pls.' Mot. for Summ J. [DE-36] at p. 6. Just as in *Strates Shows*, Plaintiffs here cannot establish proximate cause because of a host of other intervening factors, including the existence of other potential dealers and the subjective nature of Subaru's selection process. *See Strates Shows*, 379 F. Supp. 2d at 828-30 (explaining that the existence of intervening factors, such as the presence of other bidders, the lack of a set procedure or criteria for selection of midway contract vendors, and administrative discretion, weighed against a finding of proximate cause). Such a speculative contention does not suffice to establish proximate cause of injury, a necessary element of an claim under UDTPA.

Consequently, because the record shows that Plaintiffs cannot establish the third element of their UDTPA claims, Subaru is entitled to summary judgment.

## V. CONCLUSION

For the foregoing reasons, Subaru's Motion for Summary Judgment on the Issue of Liability [DE-32] is ALLOWED, and Plaintiffs' Motion for Summary Judgment as to Liability Only [DE-30] is DENIED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED. This the 30th day of May, 2008.

James C. Fox
Senior United States District Judge

18